422 F.2d 200
 LUTHERAN HOSPITALS AND HOMES SOCIETY OF AMERICA, Appellant,
v.
Charles M. DUECY, Appellee.
LUTHERAN HOSPITALS AND HOMES SOCIETY OF AMERICA, Appellant,
v.
Joseph U. CRACCHIOLO, Referee and Special Master, Appellee.
 Nos. 22844, 22931.
 United States Court of Appeals, Ninth Circuit.
 Jan. 21, 1970.
 
 Donald D. Meyers (argued), Phoenix, Ariz., Herman Weiss (argued), of Hjellum, Weiss, Nerison, & Jukkala, Jamestown, N.D., for appellant.
 Daniel T. Bergin (argued), Robert H. Carlyn, of Fennemore, Craig, Von Ammon & Udall, Richard C. Gormley, Asst. U.S. Atty., Edward E. Davis, U.S. Atty., Phoenix, Ariz., for appellees.
 Before MERRILL, KOELSCH and DUNIWAY, Circuit Judges.
 DUNIWAY, Circuit Judge:
 
 
 1
 In these appeals appellant attacks the compensation allowed to the trustee's attorney and to the referee's salary and expense fund for services of the referee-special master in a Chapter X Bankruptcy Proceeding. The applicable statute is 11 U.S.C. 641 which authorizes the court to allow 'reasonable compensation for services rendered * * * in a proceeding under this chapter.' Thus the standard is reasonableness, and in applying it the trial court is necessarily vested with a substantial discretion. Nevertheless, we have concluded that in these appeals, we should reverse.
 
 
 2
 1. The allowance to the attorney for the trustee.
 
 
 3
 One appeal is from the award to attorney Duecy, who was the attorney for the trustee. This requires some exposition of the history of the proceeding. The debtor, Arizona Lutheran Hospital, was a non-profit Arizona charitable corporation operating the Mesa Lutheran Hospital in Arizona. One of its creditors was appellant Lutheran Hospitals and Homes Society of America (Hospitals & Homes). It is a North Dakota non-profit, charitable corporation, owning and operating hospitals and other charitable institutions. The debtor was in serious financial difficulties, and there is no doubt that the trustee did an excellent job during the period while the Chapter X proceeding was pending, or that his counsel did a great deal of competent and useful work in representing, advising and assisting the trustee. No claim is made that the claimed services were not rendered, or that they were not beneficial. Appellant concedes that, for comparable work rendered in the private practice of law, the award could be sustained.
 
 
 4
 The proceeding was begun on May 26, 1964, and was successfully completed by a sale of all of the debtor's assets to Hospitals & Homes under an order confirming the plan on September 6, 1967.
 
 
 5
 On November 10, 1964, Duecy filed his first application 'for an interim allowance of compensation.' It states:
 
 
 6
 'Your petitioner * * * makes this application for an interim allowance of certain compensation for services rendered * * * for the period commencing on the 26th day of May, 1964, and ending on October 31, 1964. * * * 'The following is a summary of the services rendered * * *, which show a total time expended of Three Hundred Fifty-two, point seven hours (352.7) for which reasonable compensation should be computed at the rate of Twenty-five (25.00) Dollars per hour for Court time, and Twenty Dollars (20.00) per hour for office time. 'WHEREFORE your petitioner prays that an allowance be made to him * * * with a further proviso that these reimbursements will be subject to review by this court before final allowance is made when your petitioner's employment is terminated.'
 
 
 7
 No one objected, and the court, by order of December 18, 1964, allowed the compensation requested, $7,357.50. The order contains the following provision:
 
 
 8
 'That * * * the reimbursements for services of his attorney, and * * * for proper costs and expenses, will be subject to further review by this Court before final allowance is made in this matter.'
 
 
 9
 Duecy's second application 'for an interim allowance of compensation' was filed January 10, 1966. It recites:
 
 
 10
 'The following is a summary of the services rendered * * * which show a total time expended of 562 hours, for which reasonable compensation should be computed at the rate of Twenty-five Dollars (25.00) per hour.'
 
 
 11
 It does not ask that the allowance to be made be subject to further review, but simply prays for an allowance of $14,050, for the period November 1, 1964 to November 30, 1965. Again, no one objected. The Court's order entered March 7, 1966, allowed the requested amount, but does not state that it will be subject to further review. It merely finds 'that the sums prayed for in the petition are just and equitable,' and orders payment.
 
 
 12
 The first trustee's proposed plan of reorganization that appears in the file, December 15, 1966, recites:
 
 
 13
 'All priority claims have been paid except proper costs and expenses, compensation for fees and allowances provided for under Article XIII of Chapter X and as allowed by the Court.'
 
 
 14
 It was prepared and filed by Duecy. It refers to a study made, pursuant to court order, by Touche, Ross, Bailey & Smart, and to attached schedules 'which serve as a basis for the debt amortization schedule proposed in the plan'. Schedule A, which is attached, shows 'for payment of administrative and closing costs $50,000.' Schedule C, 'Summary' shows 'Reserve for Costs: Administrative closing fees $50,000'.
 
 
 15
 The next trustee's plan was filed December 20, 1966. It, too, was prepared and filed by Duecy. In reference to priority claims, it states:
 
 
 16
 'A provision in the plan sets aside Fifty Thousand Dollars ($50,000.00) for allowance under Article XIII. This is shown in Schedule 'A'.'
 
 It also contains the following:
 
 17
 'The payment of Administrative costs and fees has been provided for by a reserve of Fifty Thousand Dollars ($50,000.00) believed to be adequate. * * * This reserve is shown on Schedule 'C' and in the 'plan adoption payment for 1967 shown on Schedule 'A"'
 
 
 18
 Schedules A and C contain the same items, relating to this subject, as Schedules A and C in the December 15 plan.
 
 
 19
 The Touche, Ross, Bailey and Smart Feasibility Report was also filed on December 22, 1966. A schedule of 'Estimated Net Cash Refinancing' attached to the report shows, under the heading 'Plan Adoption Payments, Provision for payment of administrative and closing costs $50,000.'
 
 
 20
 The trustee filed an amended plan on January 26, 1967. Again, it was prepared and filed by Duecy. It recites:
 
 
 21
 'All costs and expenses of administration and other allowances which may be made by the Judge in the proceeding shall be paid in cash by the Trustee out of the assets in his hands or by the corporation, as the Judge shall direct. The Trustee shall set up adequate reserves for this purpose.'
 
 
 22
 The reserve to be provided for, as shown on Schedules A and C, is again $50,000.
 
 
 23
 On January 27, 1967, Hospitals & Homes filed a proposed plan. It recites that it is based in part on the Touche, Ross feasibility study and in part upon information furnished by the trustee and by Duecy. It states:
 
 
 24
 'HOSPITALS AND HOMES understand that a reserve of $50,000.00 for the payment of such expenses, costs and allowances should be adequate. * * *'
 
 
 25
 Schedules A and C show provision for administrative fees and costs of $50,000.00.
 
 
 26
 On February 27, 1967, the trustee and Hospitals & Homes filed a joint plan of reorganization. It also refers to the Touche, Ross study, and to exhibits A,B and C, 'which serve as the basis for the debt amortization schedule proposed by the plan.' The joint plan recites:
 
 
 27
 'All costs and expenses of administration and other allowances which may be made by the Court in this proceeding shall be paid in cash by the corporation or by the Trustee as the Court may hereafter direct. HOSPITALS AND HOMES understands that a reserve of Fifty Thousand Dollars ($50,000.00) for the payment of such expenses, costs and allowances should be adequate. * * *'
 
 
 28
 The plan contemplated that Hospitals & Homes would lend to a new corporation to be formed enough to provide for all cash payments to be made plus $100,000., the total loan, however, not to exceed $500,000. Among the cash payments were to be 'payment of costs and expenses of Administration of the debtor.' The attached exhibits show a reserve for these estimated costs of $50,000.
 
 
 29
 On April 7, 1967, Duecy filed another application for 'an interim allowance of compensation,' for the period December 1, 1965 to March 31, 1967. In it he recites:
 
 
 30
 'Following is a summary of the services rendered by petitioner and members of his firm herein, which shows the total time expended to be 953.3 hours, for which reasonable compensation should be computed at the rate of Thirty Dollars ($30.00) per hour for petitioner Chas. M. Duecy's time, and at the rate of Twenty-five Dollars ($25.00) per hour, for the time expended by Lewis B. Moore Jr., a member of the law firm of Duecy, Turner & Moore. Petitioner's time was 893.3 hours, and Mr. Moore's time was 60.0 hours.'
 
 
 31
 As in his January 10, 1966 application, Duecy does not ask that the allowance be made subject to further review. He simply prays for $28,299. On May 8, 1967, the judge awarded the full $28,299. In form, the order is identical to the March 7, 1966 order. This brought the awards to Duecy to a total of $49,706.50.
 
 
 32
 Meanwhile, negotiations were proceeding between Hospitals & Homes, the trustee and Duecy, and others, looking to the development of an acceptable plan. Hospitals & Homes was considering, and had drawn up a petition for the purchase of the debtor's assets. On May 17, 1966, there was a meeting attended by Knautz, Executive Director of Hospitals & Homes, the trustee Fulford, and Duecy, at the trustee's office. Also present were Weiss and Hanson from the board of Hospitals & Homes, Meyers, attorney for Hospitals & Homes and others. Knautz's testimony is as follows:
 
 
 33
 Q. And was the purpose of that meeting to determine from Mr. Fulford what the administrative expenses were going to be, and what the breakdown of those expenses was? A. Yes. * * * Q. Prior to that time, in your plans for reorganization, and also the Trustee, had you fixed a figure of $50,000., for the total remaining administrative expenses? A. We had. Q. And at the time of this meeting in Mr. Fulford's office, did you attempt to review each of the anticipated administrative expenses with Mr. Fulford? A. Yes, we did. Q. Going through each of the people who would be making application for such expenses, one by one? A. Yes. Q. And in the course of the going through those administrative expenses, did Mr. Fulford determine for you what he anticipated the remaining expenses would be for the attorney for the trustee? A. Yes, he did. * * * I think Mr. Duecy gave an amount of probably the balance. This of course was a projection, and it would be somewhere in the neighborhood of a thousand, fifteen hundred, and we discussed that a little more, and I remember Mr. Fulford saying that probably we ought to figure at least three thousand dollars. Q. You understood at that time that Mr. Duecy was attempting to project what the balance of the work would be. A. Yes, this was our understanding. * * *'
 
 
 34
 'CROSS EXAMINATION BY MR. DUECY: * * * Q. What I am trying to say, Mr. Knautz * * * is that did you ask us to make any firm commitment, * * *? A. No, at that time we did not ask for a firm, written definitive figure.
 
 
 35
 We wanted it nearly a correct figure as we could possible have. * * *
 
 
 36
 BY MR. COROTTO: Q. Mr. Knautz, as one of the other parties present at that meeting, do you recall my making a statement to everyone concerned to the effect that there should be no attempt to fix the fees in any manner whatsoever, and that the amounts of the fees in this matter would be subject to the complete discretion of the Judge? A. Yes, I remember this.'
 
 
 37
 Neither Duecy nor anyone else took the stand to deny any part of this testimony.
 
 
 38
 On the same day, May 17, 1967, Hospitals & Homes filed a petition to purchase the assets of the debtor. In it, Hospitals & Homes proposed to pay, in cash, the amount due the bondholders, with interest, the amount due secured creditors, with interest, miscellaneous obligations of the debtor, and
 
 
 39
 'D. * * * to pay in cash the administrative expenses as determined by the court after the approval of this petition. * * *'
 
 
 40
 Unsecured claims were to be paid, without interest, over a 4 1/2 year period. The petition contains no estimate of the amount of administrative costs to be paid.
 
 
 41
 On May 29, 1967, the trustee filed a revised plan, based upon the proposed sale. In essence, it merely asks the court to approve and authorize the proposed sale. It recites:
 
 
 42
 'All administrative expenses shall be paid in cash by the Society after hearing thereon and approved by the Court, pursuant to Article 13 of Chapter X.'
 
 
 43
 The court ordered the sale on June 2, 1967. It contains the following:
 
 
 44
 'IT IS FURTHER ORDERED that HOSPITALS AND HOMES shall, in addition to the payments referred to above, pay in cash the administrative expenses after applications for the same have been filed with the court, a hearing held thereon and as may be hereafter authorized by an order of this court.'
 
 
 45
 On September 6, 1967, the court entered an 'Order Confirming Plan.' It finds:
 
 
 46
 'That the plan provides that all administrative fees, expenses, compensation and allowances shall be paid for in cash by the Lutheran Hospitals and Homes Society of America, Inc., after applications for the same have been filed with the Court, a hearing held thereon and as may be authorized by Order of this Court pursuant to Article XIII of Chapter X of the Bankruptcy Act.'
 
 It orders:
 
 47
 'That all persons desiring to make application for the allowance of compensation for services rendered and reimbursement for proper costs and expenses incurred, pursuant to Article XIII of Chapter X of said Act, shall file their original petitions therefore, * * *. 25. That pursuant to 241 the application for reimbursement for proper costs and expenses by:
 
 
 48
 (a) The Referee and Special Master
 
 
 49
 (b) The Trustee and his counsel. * * * shall contain among other things, a summary of the work done and maters handled by them with a diary setting forth the time expended, supported by an affidavit in the case of the Trustee, his counsel. * * *'
 
 
 50
 Various applications were filed, including one by the trustee and his attorney, filed November 22, 1967, 'for final allowance * * * for services rendered.' This, too, was prepared and filed by Duecy. It recites interim payments to Duecy totalling $49,706.50 for services, and continues:
 
 
 51
 'That this Court in granting interim allowances did so to relieve those entitled thereto from hardship that might result from working without compensation over the extended period of time covered by the proceedings. The Court did provide by its Order of December 18, 1964, that allowances for reimbursement of costs and expenses and compensation for services rendered will be subject to further review by this Court before final allowance is made in this matter.'Note that there is no reference to the fact that the orders of March 7, 1966 and May 8, 1967, contained no such provision. The petition continues:
 
 
 52
 'That the annexed time diary of Chas. M. Duecy, Exhibit 'A', covering the period of time since April 1, 1967, to date, shows that he, and members of his firm, have expended 392.9 hours time in addition to the time previously stated. * * * That it has been recognized by Courts in this jurisdiction, that reasonable compensation for Trustees operating a business, in proceedings of this nature and of this magnitude and complexity and with the results shown, is compensable at the minimum rate of Fifteen Dollars ($15.00) per hour, and for counsel at the minimum rate of Forty Dollars ($40.00) per hour. * * *'
 
 
 53
 The prayer is for $40,729.50 for Duecy.
 
 
 54
 '* * * as partial final fees in this proceeding computed at the rate of Forty Dollars ($40.00) per hour, for a total of 2,260.9 hours for Ninety Thousand, Four Hundred Thirty-six Dollars ($90,436.00), less Forty-nine Thousand, Seven Hundred Six and 50/100 Dollars ($49,706.50), heretofore paid, and an additional sum to be compiled at the rate of Forty Dollars ($40.00), per hour spent in representing Trustee as counsel until entry of the final Order of Consummation of the plan.'
 
 
 55
 Hospitals & Homes filed objections on January 9, 1968.
 
 
 56
 At the hearing (on Duecy's petition), the trustee testified:
 
 
 57
 'Q. When did you first learn that Mr. Duecy was going to be charging $40.00 per hour? A. Just real recently. I paid no attention to his fees. Q. Was it about the time of his application in November? A. I presume so.'
 
 The former trustee also testified:
 
 58
 'Q. When did you first learn, Mr. Coats, that the charge for the attorney for the trustee was going to be $40.00 per hour? A. Mr. Duecy and I had a conversation. I think it was in November. Q. Was that 1967? A. 1967. * * *'
 
 
 59
 On March 1, 1968, the Court entered its order approving and directing payment for services. The Court found:
 
 
 60
 '* * * that the sum of $40,729.50 is reasonable as a final allowance for the balance due Chas. M. Duecy, as attorney for the Trustee, for reimbursement for proper costs and expenses and reasonable compensation for services rendered in these proceedings in addition to interim allowances heretofore approved and paid. Pursuant to the plan for reorganization heretofore approved by this Court on July 31, 1967, the LUTHERAN HOSPITALS AND HOMES SOCIETY OF AMERICA, INC., purchaser of the assets of the hospital, debtor herein, agreed to pay the remaining administrative expenses as the same might thereafter be determined by this Court.'
 
 
 61
 It orders that sum paid by Hospitals & Homes.
 
 
 62
 One cannot read this record without coming to the definite and firm conviction that a mistake has been made.
 
 
 63
 Duecy relies heavily on the fact that each of his first three petitions was expressly denominated as one for an 'interim allowance,' and that the first order expressly provided that the allowance would be subject to further review. We do not question the general rule that interim allowances, subject to further review and the award of additional compensation, may be made. See 6A, Collier, Bankruptcy (rev. ed. 1965) P13.16 at pp. 1009-1011. But, as is pointed out in In re McGann Mfg. Co., 3 Cir., 1951, 188 F.2d 110, 112, 'The allowances granted, however, should be well below any possible final allowances, for overly generous allowances might place an incentive on procrastination.' Procrastination does not appear here, but, on this record, it must be concluded that the interim allowances were not 'well below any possible final allowances.' On the contrary, the record indicates to us that each allowance was for the full reasonable value of the services that had been rendered.
 
 
 64
 Even in his first petition for fees, Duecy swore that reasonable compensation for his court time was $25 per hour and for his office time $20 per hour. Reasonable compensation is all that an attorney for a trustee in a bankruptcy proceeding is entitled to. It is true that Duecy obtained an order that the compensation allowed would be subject to further review. By reason of that reservation, Hospitals & Homes could be said to be on notice that more might be asked for and awarded. But in view of the representation as to the reasonable value of the services, and of what later occurred, we can attach little weight to it.
 
 
 65
 In Duecy's next application, filed some fourteen months later, he again swore that reasonable compensation for his services should be at $25. per hour. He did not ask the court to make its award subject to further review, and the court did not do so. The petition and the order he obtained are some indication that by then Duecy was aware that reasonable compensation was all that he was entitled to, and that he had no intention of asking for more. Hospitals & Homes was entitled to so assume.
 
 
 66
 Before Duecy's next fee application, it began to appear that a reorganization would be possible. For the trustee, he filed three proposed plans, each of which estimated all remaining expenses and fees at $50,000. Hospitals & Homes also filed a plan, containing the same provision, and it and the trustee together filed another, also containing the same provision. All but the first referred to the $50,000 reserve as 'adequate.'
 
 
 67
 Shortly thereafter, Duecy filed his third application in which he swore that reasonable compensation for himself was $30. per hour, and for his associate $25. per hour. Again, he did not ask for a reservation of the right to additional compensation, and the order prepared by him did not provide it. This application was filed about 40 days before Hospitals & Homes, in contemplation of its offer to purchase, asked him about any additional compensation that he might request. His third petition was then pending. He estimated $1000 to $1500., and the trustee, in his presence, suggested $3,000. Hospitals & Homes then filed its plan which was adopted by the trustee and approved. The proposal, and the plan as adopted, contain an open ended promise by Hospitals & Homes to pay whatever fees and expenses the court might allow.
 
 
 68
 It is impossible to believe that Hospitals & Homes would have proceeded as it did without the assurances that it obtained from Duecy, or if it had had any notion that Duecy intended to ask for an additional $40,729.50, a sum almost as large as the total that he had already received or asked for to cover services to and including a day only about six weeks before the conference. Duecy must have been aware of the purpose of the meeting; he does not deny that he knew it. Cf. Calhoun v. Hertwig, 5 Cir., 1966, 363 F.2d 257.
 
 
 69
 Duecy's subsequent action is also revealing. He did not file his fourth application until November 22, 1967, two and one-half months after the plan was confirmed. He did not tell the trustee, his client, that he was going to ask for $40. per hour until just before he filed his petition. And the petition, too, is revealing. It refers to the reservation in the first fee order, but not to the lack of it in the next two orders. It states that it is recognized by courts in the jurisdiction that reasonable compensation for the attorney in such a case as this is a minimum of $40 per hour. It makes no reference to the prior sworn statements that $25 and later $30 per hour are reasonable. And it points out that Hospitals & Homes had agreed to pay whatever the court might allow.
 
 
 70
 Duecy's application, filed for the trustee and himself, reveals that there were then pending applications as follows:
 
 
 71
 Referee $ 20,000.00
Counsel for debtor 2,167.43
Indenture trustee
 and attorney 13,415.36
Counsel for creditors'
 committee 9,293.55
Bondholders' committee 2,401.72
Trustee Fulford 18,909.92
Former trustee, Coats 15,013.95
Attorney Duecy 40,729.50
 -----------
 Total $121,931.43
 
 
 72
 All of these claims were allowed except those of the bondholders' committee and its attorney, totalling $11,160 and $2,000 of the referee's claim. Thus Hospitals & Homes is confronted with a liability of $108,771.43, plus the possibility of more to come, both for the trustee and for Duecy. Contrast this figure with the repeated estimate, by Duecy and the trustee, that $50,000. would be 'adequate,' and that additional fees for Duecy would be from $1,000. to $3,000.
 
 
 73
 The application for final allowance does not allege that at the times when the prior applications were made, $40. per hour would have been reasonable. It may well be that, with prevailing inflation between November, 1964, the date of the first application, and November 22, 1967, the date of the application for final allowance, prevailing hourly rates had risen to something like $40. It does not follow that such a rate could be retroactively applied. Nor does the record support the assertion that $40. per hour is a 'minimum rate.' Such evidence as there is points to a minimum of $30., not $40. This was under a new fee schedule issued by the Maricopa County Bar Association in July, 1967. There was no cross-examination of the witness, the immediate past president of that Bar Association, on that question.
 
 
 74
 Moreover, and more important, Hospitals & Homes was led into the predicament in which it now finds itself by representations that Duecy's additional fees would be 'in the neighborhood of a thousand, fifteen hundred', which, after further discussion, was raised to 'at least three thousand dollars.' Duecy does not deny that he and the trustee made the representations. He does not deny that he knew that Hospitals & Homes 'wanted it as nearly a correct figure as we could possibly have.' It would not be improper to hold Duecy to his word. This is in substance what was done in Calhoun v. Hertwig, 5 Cir., 1966, 363 F.2d 257. However, as will be seen, we do not go quite so far.
 
 
 75
 Reliance on 18 U.S.C. 155 is misplaced. No agreement violating that section was made. Its purpose is to keep the fees under the control of the court to prevent trustees, creditors and others, and their counsel, from playing fast and loose with other people's money in courts of bankruptcy. See In re Trans-State Oil Co., S.D. Tex., 1938, 24 F.Supp. 454, n. 1, pp. 456-457. We are not here enforcing a contract void under 155; we are applying equitable principles, akin to estoppel, to protect the appellant against unreasonable fees.
 
 
 76
 It is obvious that a solvent foreign corporation that had incautiously agreed to pay whatever the court might allow, had made itself a patsy. One must seriously doubt that any such award would have been asked for or made if it were to be paid from moneys otherwise available to general creditors. Add to all this the fact that Hospitals & Homes is a non-profit charitable corporation, and the award becomes unconscionable.
 
 
 77
 The equitable principle that, in bankruptcy matters, fees and expenses must be kept within economical bounds, and in determining them economy is the watch-word, (6 A. Collier on Bankruptcy, 13.02, 14th Ed.) is one to which Hospitals & Homes properly appeals. See Official Creditors' Committee of Fox Markets, Inc. v. Ely, 9 Cir., 1964, 337 F.2d 461; London v. Snyder, 8 Cir., 1947, 163 F.2d 621. Attorneys should be limited to reasonable compensation. That is what Duecy had already asked for and been awarded, through March 30, 1967. He is entitled only to compensation similarly measured, for services actually rendered by him after that date. According to his petition, these amount to 392.9 hours. At $30. per hour, the rate that Duecy swore was reasonable when he filed his April 7, 1967 petition, the reasonable value of these services is $11,787.00. One cannot believe that the reasonable value of his services jumped from $30. to $40. per hour beginning April 1, 1967, when they had been worth but $30. up to that date. The $40. figure is substantially higher than was asked by any other attorney. They asked from $15. to $30. per hour. It is even harder to believe that the value of his associate's service had taken a simultaneous jump in value from $25. to $40. per hour.
 
 
 78
 Duecy's award should be reduced to $11,787.00.
 
 
 79
 2. The award for services of the special master.
 
 
 80
 Next is the award to the Referee's Salary & Expense Fund. The Referee had been appointed referee and special master in the proceeding. He filed his application for compensation to the referee's salary and expense fund on February 14, 1967. In it he estimated that total obligations to be paid would exceed $4,000,000, and suggested reimbursement at 1/2 of one percent of this figure, or $20,000, stating:
 
 
 81
 'Because the file in this matter reveals that the District Judge has disposed of and determined many matters, it is suggested, that a percentage rate equal to one half that provided for in Chapter XI arrangements be utilized in this particular Chapter X proceedings.'
 
 
 82
 This notion is contrary to section 241 of the Act (11 U.S.C. 641). He made no showing whatever as to what work he had done on the case. Nor is it possible to tell from the docket just what the Referee did. But the docket does bear out his statement that most matters were handled by the judge, not by him.
 
 
 83
 As we have seen, in its September 6, 1967 order, the court directed the referee to file an application containing 'a summary of the work done and matters handled * * * with a diary setting forth the time expended.' The referee did not do so. At the hearing on the other applications, the judge stated that he had told the referee to make a showing as to the time and other bases for his claim. It was agreed that after the referee filed such a showing, counsel for Hospitals & Homes could ask for time to reply, and for a hearing.
 
 
 84
 On January 12, 1968, the referee filed an affidavit, to which he attached 'a brief outline of the various matters dealt with by' him. He adds:
 
 
 85
 'In addition, to these matters, the Referee and his office have devoted additional time which is not reflected in said Exhibit. Considerable time was spent conferring with Court Officers on this matter prior to the assumption of the case by Judge Carl A. Muecke. In addition, the Referee, in the company of the Trustee, Attorney for Trustee and other Court Officers has regularly visited Mesa Lutheran Hospital and has continually conferred with said Court Officers concerning many business matters including suggested and proposed changes and improvements in the physical plant of the hospital, and matters concerned with the operation of the hospital business, etc. Further the Referee has concerned himself continually with the financial condition of the hospital and has spent a great deal of time examining financial reports and in supervising the work of the Trustees. This supervision was in part responsible for the investment of excess hospital funds in Time Certificates of Deposit and Savings Accounts which, of course, increased income available to the hospital. It is difficult, if not impossible, to completely account for each and every hour of the time spent by the Referee and the Staff of the Referee on matters involved in this Chapter. The Referee conservatively estimates an expenditure of time of between 400 and 500 hours over the past three and three quarters years. The deponent further states that the office of the Referee has had several Chapter X's referred to it, and a great deal of time has been devoted to matters involved in said Chapters. Since such a small proportion of the time devoted by the Referee's office to Chapter X's is ever compensated, it is necessary that in successful Chapters appropriate compensation be provided.'
 
 
 86
 He also again refers to his 'percentage' suggestion.
 
 
 87
 The attached exhibit lists 61 bits of action, many of which are typified by this one:
 
 
 88
 '6-2-64 Reviewed Trustee's petition for turnover of property in possession of Donald D. Meyers and Shimmel, Hill, Kleindienst & Bishop; Signed Order to Show Cause, returnable June 10, 1964 at 3:30 P.M.'
 
 
 89
 None contains even an estimate of time spent; 39 were in 1964, 5 in 1965, 10 were in 1966, 2 of which are 'Appointment with Mr. Chuck Duecy, Attorney for trustee.' One is in 1968. In addition, the statement concludes:
 
 
 90
 'Monthly reviews were made of the following documents:
 
 
 91
 Trustee's reports and summaries of the operation of business and management of the Debtor Corp.
 
 
 92
 Interim Application for fees and allowances.
 
 
 93
 General review of all pending matters.'
 
 
 94
 He held only 7 hearings, one June 10, 1964, one July 13, 1964, one on September 30, 1964, one on October 14, 1964, one on November 5, 1964, one on January 11, 1965, one on August 12, 1966. Several of these matters were finally disposed of on stipulation. The application hardly complies with the court's September 6, 1967 order.
 
 
 95
 Counsel for Hospitals & Homes did not file any further objection, having fully stated its position in its January 9, 1968 objections.
 
 
 96
 On April 24, 1968, the court entered its order for compensation for services rendered by the referee and special master. The court found:
 
 
 97
 1. 'That the Referee, either as Referee or as Special Master, presided at hearings, held conferences or spent portions of the day reviewing pleadings on contested matters on no less than 55 separate occasions and in addition thereto reviewed the routine reports of Debtor and conferred on many occasions with the Trustee and Trustee's Counsel concerning legal, financial and operating problems concerning the Debtor corporation, and by his own estimates, all of this work totaled conservatively some 400 to 500 hours. 2. That reasonable compensation for Referee and Special Master in presiding over these hearings, holding conferences, and reviewing proceedings on the complicated contested matters in this Chapter X proceeding is no less than $45.00 per hour. * * * 4. That the presiding Judge may look to the record and his personal knowledge of the magnitude and quality of the work of the Referee and Special Master in these proceedings and the Referee and Special Master are not required to keep a detailed diary of their activities.'
 
 
 98
 It fixed compensation at $18,000, which works out at 400 hours at $45 per hour, and ordered Hospitals & Homes to pay it to the referee's salary and expense fund.
 
 
 99
 Much is made of the fact that Hospitals & Homes did not take advantage of the opportunity to file further objections offered by the court. But this is not conclusive. The court still had a duty to see that the award was no more than reasonable.
 
 
 100
 A large part of the 'services' described by the referee is mere extra curricular activity for which no award should have been made. He was appointed referee and special master. He was not appointed surrogate or auxiliary trustee, or business or management consultant, or special counsel. See 11 U.S.C. 67. And the services of a type that he was appointed to perform, that he did perform, were not extensive. The major job in this proceeding was that of the trustee, and the court allowed $15. per hour. The referee was allowed $45 per hour. At the times in issue, the referee's salary was $22,500. The award is 80% Of the referee's annual salary. This will not do. The court has neither the duty nor the right to award excessive amounts to the referee's salary and expense fund just because, as the referee suggested, there is money to be had in this case, while in many others there is none. We think that an hourly rate more nearly comparable to that awarded to counsel would be appropriate, and that the compensation should be limited to those matters properly within the duties of the special master. Hospitals & Homes should not have to pay twice for the services of the trustee, once to the trustee and once for the salary and expense fund because the special master officiously tagged along. The trial court should receive further evidence as to the nature of the services claimed to have been rendered, and modify the award.
 
 
 101
 In No. 22,844, the order awarding compensation to attorney Duecy is vacated and the matter remanded with instructions to reduce the award to $11,787.00.
 
 
 102
 In No. 22,931, the order awarding $18,000 to the referee's salary and expense fund is vacated and the matter is remanded for further proceedings consistent with this opinion.
 
 
 103
 The appellant shall recover its costs on appeal in both appeals.